CTJ/RMT

ORIGINAL

FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX.
FT. WORTH DIVISION

2009 SEP 30  PM 1:40

CLERK OF COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

|  |  |  |
|---|---|---|
| ENCLAVE ARLINGTON ASSOCIATES LIMITED PARTNERSHIP, | § § § | |
| Plaintiff, | § § | Civil Action No.: 4-09CV-155-A |
| v. | § § | |
| CITY OF ARLINGTON, TEXAS, | § § | |
| Defendant. | § § | |

---

## PLAINTIFF'S BRIEF IN SUPPORT OF ITS RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Stephen C. Carlin
State Bar No. 03807700
Russell J. DePalma
State Bar No. 00795318
R. Craig Woods
State Bar No. 24042663
GREENBERG TRAURIG, LLP
2200 Ross Avenue
Suite 5200
Dallas, Texas 75201
Telephone:  214.665.3650
Facsimile:  214.665.3601
Email: carlins@gtlaw.com

ATTORNEYS FOR PLAINTIFF ENCLAVE
ARLINGTON ASSOCIATES LIMITED
PARTNERSHIP

# **TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ...........................................................................................1

II.    SUMMARY JUDGMENT EVIDENCE .........................................................3

III.    STATEMENT OF FACTS ..............................................................................6

    A.    Defendant's Last-Minute  Traffic Plan has Provided No Relief to Enclave............7

    B.    The Value of the Apartment Complex has been Severely Impacted by Negative Media Reports Regarding Problems at the Stadium...............................10

    C.    The Stadium Itself, not just the Traffic Management Plan, is having an Unreasonable and Adverse Effect on the Enclave...................................13

    D.    Defendant Acts Unreasonably in Failing to Solicit Input from the Enclave .........15

    E.    Under the Agreement between Defendant and the Cowboys, Defendant Is in All Respects Subservient to the Cowboys .........................................18

    F.    Documents Produced by the Cowboys and Defendant Further Establish that Defendant Is In All Respects Subservient to the Cowboys ..........................21

    G.    The Cowboys and Defendant Have Always Known the Stadium Would Destroy the Value of the Enclave and was an Attractive Condemnation Target ....................................................................................................23

IV.    APPLICABLE LEGAL STANDARD .............................................................24

V.    LAW AND ANALYSIS...................................................................................25

    A.    Defendant is not Entitled to Summary Judgment on Enclave's Fourth Amendment Claim.........................................................................................25

        1.    The Fourth Amendment protects against unreasonable interferences with private property..........................................................................26

        2.    Genuine issues of material fact exist regarding Defendant's meaningful interference with Enclave's possessory interest in the Apartment Complex..........................................................................27

        3.    Genuine issues of material fact exist regarding the "reasonableness" of Defendant's Interference with Enclave's possessory interest in the Apartment Complex..........................................................................32

B.     Defendant is not Entitled to Summary Judgment on Enclave's Fifth Amendment Claim ..............................................................................37

      1.     Defendant misrepresents the standard for Fifth Amendment takings claims ..........................................................................................38

      2.     Defendant's conduct amounts to a taking of the Apartment Complex ......39

      3.     Defendant took the Apartment Complex to serve a private use ................41

C.     Defendant is not Entitled to Summary Judgment on Enclave's Fourteenth Amendment Claim ..............................................................................44

D.     Defendant is not Entitled to Summary Judgment on Enclave's Private Nuisance Claim ..................................................................................45

VI.     CONCLUSION....................................................................................47

## **TABLE OF AUTHORITIES**

**Page**

**Federal Cases**

*Aero Meridian Associates DP v. City of Denison*
No. 4:06cv457, 2007 WL 2900536 (E.D. Tex. Sept. 28, 2007) ........................................39, 41

*Besteman v. Hager*
No. 06-10223-BC, 2007 WL 1686513 (E.D. Mich. Jun. 8, 2007) ....................................33

*Blackmon v. Regis*
No. 95 C 4559, 1996 WL 660650 (N.D. Ill. Nov. 12, 1996).....................................................33

*Celanese Corp. v. Coastal Water Auth.*
475 F. Supp. 2d 623 (S.D. Tex. 2007) .............................................................................45, 46

*Connolly v. Pension Benefit Guar. Corp.*
475 U.S. 211 (1986).....................................................................................................................39

*Freeman v. City of Dallas*
242 F.3d 642 (5th Cir. 2001) ...............................................................................26, 32, 35, 36

*Gonzalez v. City Plan Com'n*
No. Civ.A.3:05-CV-1737-M, 2006 WL 278985 (N.D. Tex. Feb. 3, 2006).........................28, 31

*Hawai'i Hous. Auth. v. Midkiff*
467 U.S. 229 (1984)......................................................................................................................37

*Hill v. City of New York*
No. 03 CV 1283(ARR), 2005 WL 3591719 (E.D.N.Y. Dec. 30, 2005)....................................32

*Honore v. Douglas*
833 F.2d 565 (5th Cir. 1987) ......................................................................................................44

*Jarrett v. Town of Yarmouth*
331 F.3d 140 (1st Cir. 2003)........................................................................................................32

*John Corp. v. City of Houston*
214 F.3d 573 (5th Cir. 2000) ......................................................................................................27

*Keelan v. Majesco Software, Inc.*
407 F.3d 332 (5th Cir. 2005) ......................................................................................................24

*Kelo v. City of New London*
545 U.S. 469 (2005)......................................................................................................37, 43, 44

*Lingle v. Chevron U.S.A. Inc.*
544 U.S. 528 (2005)..................................................................................................41

*Lucas v. South Carolina Coastal Council*
505 U.S. 1003 (1992)................................................................................................38

*Martin v. Alamo Cmty. Coll. Dist.*
353 F.3d 409 (5th Cir. 2003) ..................................................................................25

*Matsushita Elec. Indus. Co., ltd. v. Zenith Radio Corp.*
475 U.S. 574 (1986).................................................................................................25

*Momax, LLC., v. Rockland Corp.*
2005 WL 839402 (N.D. Tex. April 11, 2005) .........................................................25

*Munoz v. Orr*
200 F.3d 291 (5th Cir. 2000) ..................................................................................25

*Penn Cent. Transp. Co. v. City of New York*
438 U.S. 104 (1978).................................................................................................39

*Pennsylvania Coal Co. v. Mahon*
260 U.S. 393 (1922).................................................................................................39

*Pepper v. Village of Oak Park*
430 F.3d 805 (7th Cir. 2005) ..................................................................................28

*Presley v. City of Charlottesville*
464 F.3d 480 (4th Cir. 2006) ...............................................................27, 28, 29, 32

*Presley v. City of Charlottesville*
No. 3:05-CV-00010, 2005 WL 2487952 (W.D. Va. Oct. 7, 2005) ....................28, 29

*Recursion Software, Inc. v. Interactive Intelligence, Inc.*
125 F. Supp. 2d 756 (N.D. Tex. 2006) ....................................................................24

*Reeves v. Sanderson Plumbing Prods., Inc.*
530 U.S. 133 (2000)............................................................................................24, 25

*Rochin v. California*
342 U.S. 165 (1952).................................................................................................44

*Rumber v. District of Colum.*
487 F.3d 941 (D.C. Cir. 2007) ................................................................................37

*Samaad v. City of Dallas*
  940 F.2d 925 (5th Cir. 1991) ...................................................................................41

*Schmalz v. Oleszak*
  No. 08-C-313, 2009 WL 2766740 (E.D. Wis. Aug. 31, 2009)....................................32

*Severance v. Patterson*
  566 F.3d 490 (5th Cir. 2009) ....................................................................................26

*Simi Inv. Co. v. Harris County*
  236 F.3d 240 (5th Cir. 2000) ....................................................................................27

*Soldal v. Cook County, Ill.*
  506 U.S. 56 (1992)..............................................................................26, 28, 29, 32

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*
  535 U.S. 302 (2002).............................................................................................38, 39

*United States Bank, N.A. v. City of Irving*
  No. 3:06-CV-1805-G, 2007 WL 1073769 (N.D. Tex. Apr. 5, 2007) ..........................27

*United States v. Gray*
  484 F.2d 352 (6th Cir.1973) .....................................................................................28

*United States v. Jacobsen*
  466 U.S. 109 (1984).............................................................................................26, 28

*United States v. James Daniel Good Real Property*
  510 U.S. 43 (1993).................................................................................................26, 31

*United States v. Place*
  462 U.S. 696 (1983).............................................................................................28, 31

**State Cases**

*City of Abilene v. Downs*
  367 S.W.2d 153 (Tex. 1963)......................................................................................45

*City of Dallas v. Jennings*
  142 S.W.3d 310 (Tex. 2004)......................................................................................46

*City of Grapevine v. Grapevine Pool Rd. J.V.*
  804 S.W.2d 675 (Tex. App.—Fort Worth 1991, no writ) ...........................................46

*State of Texas v. Bristol Hotel Asset Co.*
  No. 07-0896, 2009 WL 1383717 (Tex. May 15, 2009)...............................................47

**Federal Statutes**

42 U.S.C. § 1983 ...............................................................................................................28

U.S. CONST. amend. IV......................................................................................................26

U.S. CONST. amend. V ..................................................................................................37, 39

**Federal Rules**

FED. R. CIV. P. 56................................................................................................................3

Plaintiff Enclave Arlington Associates Limited Partnership ("Enclave") files this Brief in Support of its Response in Opposition to Defendant's Motion for Summary Judgment, stating as follows:

## I.     <u>INTRODUCTION</u>

Despite a third chance to obtain dismissal of this case before even a single deposition is taken, Defendant City of Arlington ("Defendant" or the "City") has not met and cannot meet its summary judgment burden. Defendant has not shown that there is no issue of material fact regarding Enclave's claims. Instead, Defendant ignores most of Enclave's arguments and focuses almost the entirety of its Motion on one single aspect of this case – Defendant's traffic management planning in connection with the Cowboys Stadium (the "Stadium"). Make no mistake, Defendant's traffic planning efforts have fallen far short of promises made to this Court by Defendant at the June 4, 2009 injunction hearing. ("Injunction Hearing"). The barricades continue to be unsurpassable, traffic continues to prevent reasonable, and sometimes *any*, access to the property and police officers refuse to honor the alleged "badge" system or to provide any assistance to the Enclave's residents.

Half-hearted unfinished traffic planning is less than half the story. Enclave's claims also deal with crime, continuous noise at all hours of the night, pedestrian hordes, late-night fireworks that wake residents, including young children, negative publicity regarding traffic, noise, drunkenness, and congestion at the Stadium, and ultimately, the knowingly irresponsible decision to place the NFL's largest football stadium approximately fifty feet from a residential apartment complex. Despite these being factors in all of the Enclave's claims, Defendant's Motion is silent on these issues.

In truth, the recent and ongoing production of documents by Defendant and the Dallas Cowboys ("Cowboys"), coupled with the actual events that have occurred at Cowboys Stadium (the "Stadium") since its opening, reveal that Defendant has violated the Fourth, Fifth and Fourteenth Amendments of the United States Constitution and created a massive private nuisance in the Enclave's front yard. Defendant's conduct amounts to an unreasonable seizure of property in violation of the Fourth Amendment by:

1.  conspiring with a private party to turn over or grant a veto to that party with respect to condemnation, traffic and safety planning;

2.  allowing that private party to control and conduct operations that have effectively surrounded and imprisoned the Enclave's tenants and employees before, during and after stadium events;

3.  knowing three years ago in private correspondence that the construction and operation of the Stadium as planned would destroy the Enclave's residential apartment business;

4.  failing to honor the commitments made to the Enclave and this Court in implementing its traffic safety and alleged "badge" system by randomly refusing to allow ingress or egress to the Enclave regardless of whether a badge was present;

5.  failing to prevent excessive noise, traffic, drinking and criminal conduct around the Enclave Apartment of Arlington, Texas (the "Apartment Complex") in connection with stadium events;

6.  allowing its tenant to promote mob behavior within thirty feet of the Apartment Complex's entrance by overselling standing-room-only tickets and then failing to have proper procedures in place to account for such crowds or safely facility their entry into the Stadium; and

7.  refusing to assist tenants and employees of the Apartment Complex to enter or leave the property because, according to one officer, *we work for the Stadium, not for you.*"

This abdication of authority and asphyxiation of the Enclave amounts to an unreasonable seizure of property in violation of the Fourth Amendment. Nothing in the Constitution countenances such conduct or allows a city to turn over its fundamental obligation to protect the safety and

property of its citizens to a private party for a purpose that it **knows** will destroy such property. There is no immunity for such reprehensible conduct.

Despite the Court's expressed concerns regarding the viability of Enclave's Fifth and Fourteenth Amendment challenges, the Enclave reurges them here, especially given the newly revealed evidence of Defendant's knowledge of the Stadium's effects on the Enclave years beforehand and the chaos and danger at Stadium events that have borne out the worst fears of Enclave. These risks are no longer hypothetical, they are fact. Moreover, given the amount of evidence Enclave has discovered despite the abbreviated discovery period and Defendant's ongoing and defective document production, there is reason to believe that more evidence will be revealed once Defendant finally completes its document production and offers at least two or three key participants for deposition.[1]

Thus, genuine issues of material fact remain for a jury to decide and Defendant's Motion should be denied in its entirety.

## II.   SUMMARY JUDGMENT EVIDENCE

In accordance with the Court's order dated July 8, 2009, all of the exhibits and testimony provided during the Preliminary Injunction hearing held on June 4, 2009 ("Injunction Hearing") are incorporated herein as part of the summary judgment record. In support of its Response to

---

[1] Enclave's ability to conduct and full and meaningful review of the evidence has been severely hampered by the untimeliness of Defendant's document production. In particular, Defendant just produced another 1,490 pages of documents the day before Enclave's summary judgment response deadline. Defendant also produced an additional 35,000 pages of documents on September 23rd and 24th, less than one week before Enclave's summary judgment response deadline. Enclave has had no opportunity to conduct a reasonable review of this last-minute production. This, coupled with the fact that Defendant previously unloaded approximately 200,000 other pages of documents on Enclave without first reviewing or culling them for responsiveness has forced Enclave to drastically limit its document review efforts and forego any depositions just to have some opportunity to search through Defendant's production. Consequently, given the opportunity to conduct a more meaningful and comprehensive review of Defendant's discovery, Enclave is confident that additional documents would be found. Regardless, this conduct does not comply with the Court's order directing the parties to cooperate in discovery.

Defendant's Motion brought pursuant to FED. R. CIV. P. 56, Enclave attaches and incorporates by reference the following additional evidence:

| TAB NO. | DOCUMENT | APP. NO. |
|---|---|---|
| Exhibit 1: | Affidavit of Melissa Wilkins dated June 3, 2009, and admitted at the Injunction Hearing as Plaintiff's Exhibit 25. | APP. 001-011 |
| Exhibit 2: | Map of Lot Operations admitted at the Injunction Hearing as Plaintiff's Exhibit 2. | APP. 012 |
| Exhibit 3: | Declaration of Gregory Adcock dated September 29, 2009. | APP. 013-016 |
| Exhibit 4: | Declaration of Melissa Wilkins dated September 29, 2009. | APP. 017-033 |
| Exhibit 5: | Declaration of Chris Sparks dated September 29, 2009. | APP. 034-036 |
| Exhibit 6: | Certified Copy of Injunction Hearing Transcript. | APP. 037-177 |
| Exhibit 7: | Document produced by Dallas Cowboys entitled "PB Sports Special Events - Dallas Cowboys Off-Site Operations Manual" dated May 3, 2009 and numbered TEAM 002232. | APP. 178-181 |
| Exhibit 8: | Document produced by Dallas Cowboys entitled "George Strait Concert - June 6, 2009" and numbered TEAM 000255. | APP. 182 |
| Exhibit 9: | "Cowboys Stadium traffic frustrates neighbors in Arlington," The Dallas Morning News, September 21, 2009. | APP. 183-184 |
| Exhibit 10: | "Cowboys Stadium shakes up life for nearby homeowners," The Dallas Morning News, September 17, 2009. | APP. 185-187 |
| Exhibit 11: | "Did they let the party get too big at Cowboys Stadium?" The Dallas Morning News, September 22, 2009. | APP. 188-191 |
| Exhibit 12: | Affidavit of Theron L. Bowman, Police Chief for the City of Arlington admitted at Injunction Hearing as Defendant's Exhibit 2. | APP. 192-197 |
| Exhibit 13: | "Texas alcohol commission investigating Cowboys Stadium after general manager's arrest," The Dallas Morning News, June 12, 2009. | APP. 198-199 |

| **TAB NO.** | **DOCUMENT** | **APP. NO.** |
|---|---|---|
| Exhibit 14: | "Cowboys Stadium GM gets time on work detail for DWI," The Dallas Morning News, September 25, 2009. | APP. 200 |
| Exhibit 15: | Affidavit of Doris Morrow dated June 3, 2009, admitted at the Injunction Hearing as Plaintiff's Exhibit 26. | APP. 201-203 |
| Exhibit 16: | Master Agreement Regarding Dallas Cowboys Complex Development Project admitted at the Injunction Hearing as Plaintiff's Exhibit 8. | APP. 204-253 |
| Exhibit 17: | Cowboys Complex Lease Agreement admitted at the Injunction Hearing as Plaintiff's Exhibit 16. | APP. 254-320 |
| Exhibit 18: | Email between Jud Heflin and Keith Melton dated March 9, 2009 regarding "hangtags," produced by the City of Arlington and numbered ARL 0010891. | APP. 321 |
| Exhibit 19: | Memorandum from Robert Brooks to Jud Heflin regarding TMP Critical Issue - On-Street Parking in Neighborhoods, dated February 24, 2009, produced by the Dallas Cowboys and numbered TEAM 001233. | APP. 322 |
| Exhibit 20: | Email between Jim Self and Ron Underwood, Jud Heflin, Paul Turner, and Jack Hill regarding "Bomb sweep after action report - confidential FOUO," dated July 27, 2009, produced by the Dallas Cowboys and numbered TEAM 001966. | APP. 323 |
| Exhibit 21: | Correspondence between Bob B. and Keith regarding the "Off-Site Dallas Cowboys Gameday Operations Manual" produced by the Dallas Cowboys and numbered TEAM 000020. | APP. 324 |
| Exhibit 22: | Memorandum between Jud Heflin, Will Johnson, and Don Crowson regarding "Public Safety Planning - New DC Venue," produced by the Dallas Cowboys and numbered TEAM 000025. | APP. 325 |
| Exhibit 23: | Agenda and Minutes of Entertainment District Project Updates Teleconference dated April 9, 2009, produced by the Dallas Cowboys. | APP. 326-329 |

| **TAB NO.** | **DOCUMENT** | **APP. NO.** |
|---|---|---|
| Exhibit 24: | Agenda of Entertainment District Project Updates Teleconference dated September 11, 2008, produced by the Dallas Cowboys. | APP. 330-331 |
| Exhibit 25: | Email between Jud Heflin and Stephen Jones, George Bayoud, and Jerry Jones, Jr. regarding "Enclave - disc. points.doc, lease clause - street naming.pdf, flood plane vs property boundary.ppt," dated June 14, 2006 and produced by the Dallas Cowboys. | APP. 332-336 |
| Exhibit 26: | Report of Occupancy - The Enclave, admitted at the Injunction Hearing as Plaintiff's Exhibit 15. | APP. 337 |
| Exhibit 27: | Affidavit of Amber Shaffer dated June 3, 2009, admitted at the Injunction Hearing as Plaintiff's Exhibit 27. | APP. 338-340 |
| Exhibit 28: | City of Arlington, Texas Crime Statistics, available at http://www.arlingtonpd.org/CrimeStats/CrimeSearch.asp. | APP. 341-352 |
| Exhibit 29: | Cowboys Complex Funding and Closing Agreement between City of Arlington, Texas and Cowboys Stadium, L.P., dated February ___, 2005. | APP. 353-379 |

Other evidence likely exists, but Enclave has been prevented from conducting a review of Defendant's production due to Defendant's failure to produce documents in a timely manner.

### III. STATEMENT OF FACTS

To ensure that all the presently known summary judgment evidence is properly before the Court, the following Statement of Facts includes both recent events regarding the opening of the new Stadium and previous evidence established at the Injunction Hearing and prior briefing. As such, some of the information contained below has appeared in prior submissions. This is not by accident. Such problems still remain at the Apartment Complex today and are no less "evidence" to support this response.

A.   **Defendant's Last-Minute Traffic Plan has Provided No Relief to Enclave.[2]**

Contrary to Defendant's claims, Enclave's problems have not improved since the Stadium's opening or the implementation of Defendant's nebulous traffic management plan. Indeed, the faux "badge" or "tagging" system implemented by Defendant in response to this lawsuit has not functioned as planned.[3] Many people have reported being turned away by police officers manning the street barricades, even after displaying the appropriate badge to the officer.[4] These police officers frequently indicated that they had no knowledge of the badge system and were never informed of any special rules or procedures regarding residents or guests of the Enclave.[5] If people *with* badges have been turned away, it is also reasonable to assume that even more people *without* badges have been denied access to the property. Moreover, because of the massive traffic problem in the area, most people are forced to endure long wait times before even reaching the barricades to gain access to the Apartment Complex because officers refuse to halt pedestrian flow for even a minute to allow vehicles in and out of the Apartment Complex.[6]

---

[2]   As set forth in the first Affidavit of Melissa Wilkins and as illustrated in a map contained in the Appendix as Exhibit 2 (APP. 012), Enclave owns the Apartment Complex located at 1249 Enclave Circle, Arlington, Texas, 76011 directly across Randol Mill Road from the new Cowboys Stadium. Randol Mill Road abuts the Apartment Complex's south side and is a main artery for pedestrians and motorists in the area, providing primary access to Six Flags Parks, the Ballpark at Arlington, and various other restaurants, hotels, shops and businesses in the surrounding community.

Randol Mill Road is also the primary ingress and egress point for Enclave's residents, guests and employees. The Apartment Complex is accessible via an operational gate that feeds directly onto Randol Mill Road and is the only gate capable of allowing motorists to both enter and exit the property. The only other means of accessing the Apartment Complex is an exit-only gate located on Cedarland Plaza Boulevard, a back-road on the property's north side that separates the Apartment Complex from a single-family residential neighborhood. The rear gate is not designed to handle two-way traffic. A manual gate also exists at the back of the Apartment Complex, but it remains locked by the Defendant's fire department and can only be opened by calling the fire department to remove the lock.

Cedarland Plaza Boulevard feeds into Legends Way (previously Baird Farm Road), which abuts the Apartment Complex's east side. Cedarland Plaza Boulevard has a grass and cement median that prevents anyone from turning left onto Legends Way. Defendant closes Legends Way to motorist traffic for special events and has placed barricades at both ends of Cedarland Plaza Boulevard, thereby restricting access to Cedarland Plaza Boulevard.
[3]   Exhibit 4 at ¶ 9-12 (APP. 019-020); Exhibit 3 at ¶ 13 (APP. 016).
[4]   Exhibit 4 at ¶ 9-12 (APP. 019-020).
[5]   Exhibit 4 at ¶ 9-12 (APP. 019-020); Exhibit 3 at ¶ 13 (APP. 016).
[6]   Exhibit 3 at ¶¶ 5-8, 10, 11 (APP. 014-015); Exhibit 5 at ¶¶ 5, 6, 9 (APP. 035-036).

Compounding the problem is that police officers apparently have joined with Defendant in abdicating all control to the Cowboys – when asked by a tenant to assist with stopping pedestrian traffic so the tenant could actually leave the property, this same officer responded that he "worked for the Cowboys, not the Enclave."[7]

Of course, none of this is surprising because Defendant threw together its traffic management plan for the Enclave at the last minute in order to appear reasonable in front of the Court. According to Keith Melton, Defendant's Assistant Director of Public Works, the traffic management plan was an untimely, incomplete afterthought that the Cowboys did not begin to develop until late 2008.[8] Indeed, Defendant did not give Melton any authority to hire people with traffic expertise until the final stages of the Stadium's construction and did not begin working on the traffic management plan until late in the process.[9] Melton's testimony demonstrates that the interests of the Enclave were never a consideration during the traffic planning process:

> Q:   Did the City ever request that the Cowboys keep Randol Mill Road
>       open so that Enclave residents could access it?
>
> A:   No.[10]

The traffic plan was not prepared by Defendant; it was developed exclusively by the Cowboys.[11]

By its own admission, Defendant had no plans addressing the Enclave until Enclave filed suit against Defendant earlier this year.[12] For example, as of May 3, 2009, the Cowboys and Defendant were still exchanging documents regarding the "Cowboys Stadium Off-Site Operations Manual" indicating that (1) Defendant never requested an off-site operations plan; (2)

---

[7] Exhibit 3 at ¶ 13 (APP. 016).
[8] Exhibit 6 at 99:7 – 99:11 (APP. 135).
[9] Id. at 98:18 – 98:24 (APP. 134).
[10] Id. at 100:11 – 100:25 (APP. 136).
[11] Id. at 97:11 – 97:15 (APP. 133).

the Cowboys operational plans lacked detail; (3) the Cowboys failed to provide a detailed diagram of cones and barriers; (4) road closures lacked appropriate signage; and (5) various other problems existed at the time regarding the development of an off-site operations plan.[13]  By May 18, 2009, less than one month before the Injunction Hearing, Defendant still had not informed Enclave of its traffic plan for the area surrounding the Apartment Complex.[14]  At the Injunction Hearing, Defendant finally articulated for the first time a scheme that would allegedly allow visitors and residents of the Enclave to bypass its system of road barricades.  Indeed, Counsel for Defendant confirmed in his opening remarks to the Court that Defendant's badge system and plan to allow access to the property was realized just *two* nights before the Injunction Hearing.[15]

The effects of piecing together a traffic plan at the last minute and giving no consideration to the Enclave's concerns are now being felt today.   Since Defendant opened the Stadium to sporting events and musical concerts, overwhelming traffic congestion, hordes of loitering pedestrians, and crime and arrests have plagued the area surrounding the Apartment Complex, holding the Enclave hostage.[16]  As evidenced in at least one memorandum generated by Defendant, police have arrived late to some events and were "uninformed" as to the specifics of the traffic management plan.[17]  Taxi and limo services also caused traffic problems.[18]  Enclave retained the services of a video surveillance crew to document some of these problems,[19] which include the following:

---

[12] *Id.* at 18:4 – 19:8 (APP. 054-055).
[13] Exhibit 7 at 1-3 (APP. 178-180)
[14] Exhibit 6  at 101:8 – 101:23 (APP. 137).
[15] *Id.* at 18:4 – 19:8 (APP. 054-055).
[16] Exhibit 3 at ¶ 5-13 (APP. 014-016); Exhibit 5 at ¶ 5-9 (APP.  035-036).
[17] Exhibit 8 (APP. 182).
[18] *Id.*
[19] Exhibit 3 at ¶ 2-4 (APP. 013-014); Exhibit 5 at ¶ 2-4 (APP. 034-035).   Notably, Enclave only committed surveillance resources for a few of the actual events.  However, Enclave understands that similar problems occurred at other Stadium events.

- **June 6, 2009 – George Strait and Reba McEntire Concert:** Large crowds and traffic jams prevented concertgoers from entering and exiting the Apartment Complex. Police officers assisted vehicles leaving the Stadium, but refused to provide any assistance to cars leaving the Apartment Complex. Moreover, the concert ended late at night, 11:00 p.m., causing thousands of fans and revelers to pass directly outside the Apartment Complex long after many residents had already retired for the evening.[20]

- **June 20, 2009 -- Jonas Brothers Concert:** Large numbers of concertgoers traveling in front and around the Apartment Complex blocked vehicles from entering or exiting the Enclave. Police officers on site also failed to intervene and facilitate access to the Apartment Complex.[21]

- **July 19, 2009 – Gold Cup Soccer Matches:** Once again, large crowds of soccer fans prevented reasonable access to and from the Apartment Complex and forced residents to wait extended periods of time before turning in to or departing the Enclave.[22]

- **July 26, 2009 – World Football Challenge:** The World Football Challenge created some of the largest problems to date. In particular, King Cab utilized the Enclave's entrance as a drop-off point for patrons attending the soccer match and large numbers of fans loitered directly in the front drive of the Apartment Complex. Traffic became so heavy that it took approximately six minutes for a car to travel from the turn lane on Collins Street to the entrance of the Apartment Complex. Some vehicles took in excess of eight minutes just to turn out of the entrance of the Apartment Complex; others simply gave up after the long wait. A few residents of the Enclave were able to walk to a nearby convenience store and back before traffic moved more than 1/10 of a mile. Police officers also stated that they only worked for the Stadium and would do nothing to help facilitate access to and from the Enclave.[23]

B.   **The Value of the Apartment Complex has been Severely Impacted by Negative Media Reports Regarding Problems at the Stadium.**

There has not been sufficient time to conduct discovery on some of these issues, but many of the problems experienced at the Stadium have been well-documented by local media

---

[20] Exhibit 3 at ¶ 5-7 (APP. 014-015).
[21] Exhibit 5 at ¶¶ 5-7 (APP. 035-036).
[22] *Id.* at ¶¶ 8-9 (APP. 036).
[23] Exhibit 3 at ¶¶ 8-13 (APP. 015-016).

outlets. Stores report that rather than an economic boom, the Stadium has negatively impacted sales because the general public will avoid traffic on game days.[24]   Residents complain about traffic congestion and illegal parking.[25]   One person noted that it took him 30 minutes to travel four or five blocks and that trying to exit his own neighborhood "is ridiculous."[26]   Other residents admit that they will actively pursue selling their home once the economy improves to get away from the congestion and problems.[27]   Some residents describe the stifling conditions as "a prison."[28]

On September 2, 2009, two days after the first regular season football game at the Stadium, the Dallas Morning News ran an article titled "Did they let the party get too big at Cowboys Stadium?" citing many of the problems experienced by people in the area and visitors to the Stadium.[29]   According to this article, the horde of fans standing outside the Stadium, directly across from the Enclave, became hostile and aggressive while waiting to access the Stadium.[30]   Fans threw plastic bottles and pounded on glass doors in frustration.   Some fans reported that it took more than an hour to enter the Stadium.[31]   According to Defendant's representatives, "crowd crush" and "crowd collapse" are potential problems at the Stadium due to the large amount of standing-room-only seats sold for games.[32]   Defendant's representatives admitted that "the department made some assumptions [about the crowd] before the weekend *that didn't work out*."[33]   According to the article, crime was also a major concern – 37 people

---

[24] Exhibit 9 at ¶¶ 14-20 (APP. 184).
[25] *Id.* at ¶¶ 3, 6, 8 (APP. 183); Exhibit 10 at ¶¶ 2-4, 8-9 (APP. 185).
[26] Exhibit 10 at ¶ 9 (APP. 185).
[27] *Id.* at ¶ 21 (APP. 186).
[28] *Id.* at ¶ 4 (APP. 185).
[29] Exhibit 11 (APP. 188-191).
[30] *Id.* at ¶¶ 1, 5, 8-10 (APP. 188).
[31] *Id.* at ¶ 17 (APP. 189).
[32] Exhibit 11 at ¶ 30 (APP. 189-190).
[33] *Id.* at ¶ 32 (APP. 190).

were arrested at the football game, including 30 for public intoxication.[34]   This fact runs

contradicts the claim of the City's police chief in his Affidavit that he "[did] not expect crime in

or around the Enclave to increase . . . prior to, during or following events at Cowboys

Stadium."[35]   Because of the negative publicity the Stadium venue has received, Enclave's ability

to market the Apartment Complex has been devastated.[36]   Indeed, the occupancy rate for the

Enclave dropped from 87.6% to 79.31% between December 1, 2008 and May 11, 2009 alone.[37]

In addition, the percentage lease rate dropped from 91% to 75% during the same time period. [38]

The Enclave had to grant significant concessions to entice new tenants to the property.[39]

All of these current problems are in addition to the problems residents have already been

forced to suffer through before the Stadium opened to the public.   Prior to the Injunction

Hearing, Defendant had closed roads and erected barricades, which caused massive delays and

forced Enclave's residents to use alternate, remote routes to reach their homes, with many

complaining that they "can't get home" at all.[40]   These alternate routes were not merely

inconvenient – in some instances residents have complained that they were forced to travel an

extra 40 minutes to reach the Apartment Complex.[41]   Many of these residents have small

children at home or have medical conditions that require ready access to medications.[42]   These

problems have been exacerbated by increased crowds at the Stadium.

---

[34] *Id.* at ¶ 25 (APP. 189).
[35] Exhibit 12 at ¶ 8 (APP. 196).
[36] Exhibit 1 at ¶¶ 27-29 (APP. 010).
[37] *Id.*
[38] *Id.*
[39] Exhibit 4 at ¶ 18 (APP. 021).
[40] *Id.*
[41] *Id.*
[42] Exhibit 1 at ¶ 22 (APP. 008); Exhibit 6 at 36:22 – 37:9 (APP. 072-073).

**C.**     **The Stadium Itself, not just the Traffic Management Plan, is having an Unreasonable and Adverse Effect on the Enclave.**

This litigation is about more than Defendant's traffic management plan and implicates Defendant's decision to place the National Football League's largest stadium in the Enclave's front yard.    For instance, as long as a Stadium exists within a few feet of the front entrance of Enclave, problems will continue to exist, traffic will abate, and Enclave and its residents will be forced to suffer unless appropriate relief is granted.

Moreover, since the opening of the Stadium, numerous arrests have occurred for public intoxication and DWI and the Texas Alcohol and Beverage Commission is now reexamining the Cowboys' liquor license.[43]    Even the project planner for the Stadium has been arrested for DWI.[44]    Most, if not all, of these fans pass within mere feet of the Apartment Complex.[45] Stadium visitors typically begin tailgating and drinking before events begin and often continue gathering long after the game or event concludes.[46]    People tailgate in close proximity to the Enclave and some of the residents have complained about the crowds.[47]    After the event concludes, most of these people pass directly next to the gates of the Enclave.[48]

Special events and games last late into the night and cause significant noise and disruption, thus making it virtually impossible for families with small children to live at the Apartment Complex.[49]    For example, the Cowboys have previously launched loud firework shows for certain events, which, in the words of some residents, sound like bombs going off in

---

[43] Exhibit 13 at ¶ 1 (APP. 198).
[44] Exhibit 14 at ¶ 2 (APP. 200).
[45] Exhibit 1 at ¶ 20 (APP. 007); Exhibit 5 at ¶ 5 (APP. 035); Exhibit 3 at ¶ 5 (APP. 014).
[46] Exhibit 4 at ¶ 16 (APP. 020-021).
[47] *Id.* at ¶ 15 (APP. 020).
[48] Exhibit 1 at ¶¶ 20, 21 (APP. 007-008); Exhibit 5 at ¶ 5 (APP. 035); Exhibit 3 at ¶ 5 (APP. 014).
[49] Exhibit 4 at ¶ 15 (APP. 020).

the area.[50]   Traffic also is loud and further impacts the sanctity of the Apartment Complex's grounds.[51]

In addition to the aforementioned problems, Enclave and its residents still have concerns regarding the potential for increased crime incidents at the Apartment Complex due to heavy pedestrian traffic and late-night exuberance.  The Apartment Complex has no way of preventing pedestrians from cutting across the property and causing damage to the grounds.[52]  The Enclave is currently protected by only a three and a half foot tall metal fence in the areas where pedestrians typically pass.[53]  Prior to the Stadium, this fence was sufficient to protect the property because pedestrian traffic was virtually non-existent.[54]  Now, however, the fence is insufficient because it is not designed to keep out more than 90,000 people or even a small fraction of the number of people that will be in the area for special events.[55]  It is not difficult for people to climb or go through the fence and Enclave has no other way of preventing their trespass on the property.[56]  While Defendant claims that additional police can prevent these occurrences, it is unreasonable to believe that a couple of extra police officers can impact the increased risk of trespass and property damage caused by 90,000 additional pedestrians.[57]  As an added precaution, Enclave hired additional security personnel to protect the Apartment Complex's residents and prevent vandalism.[58]

---

[50] Exhibit 4 at ¶ 13  (APP. 020).
[51] *Id.* at ¶ 15 (APP. 020).
[52] Exhibit 1 at ¶¶ 20, 21 (APP. 007-008).
[53] *Id.*
[54] *Id.*
[55] *Id.*
[56] *Id.*
[57] *Id.*
[58] *Id.*

Finally, as previously established at the Injunction Hearing, the Apartment Complex is home to numerous senior citizens and residents with medical conditions.[59] Unobstructed access to medical and emergency services is required for these residents.[60] At times, ambulances or fire trucks need immediate access to the property and will not have it if the road closures continue to create the amount of traffic already seen in the area for special events at the Stadium.[61]

## D.  **Defendant Acts Unreasonably in Failing to Solicit Input from the Enclave.**

Many of the aforementioned problems at the Stadium and around the Apartment Complex are the result of Defendant's failure to solicit input from the Enclave and complete willingness to turn over all control for planning that impacts the lives of citizens to the Cowboys. Defendant's abdication of its municipal duties is further evidence of the wholly unreasonable restrictions Defendant has placed on Enclave's use of the Apartment Complex.

By their own calculations, Defendant and the Cowboys plan not only to have eight (8) home regular season football games at the Stadium, but numerous other collegiate and high school football games, concerts and special sporting events that will fill the 90,000-plus seat venue on numerous days per year.[62] Already scheduled for the Stadium are the 2010 Cotton Bowl, Super Bowl XLV, annual Texas A&M vs. Arkansas football games, the Big 12 Football Conference Championship; and the NBA All-Star Game.[63] By its own admission, Defendant expects and has already hosted as many as *30,000* additional vehicles and *100,000* additional pedestrians or fans in the area for special events and Cowboys games.[64] Indeed, as shown below, at the first Cowboys' home game on September 20, 2009, more than 105,000 fans jammed into

---

[59] Exhibit 15 at ¶¶ 2, 4 (APP. 201-202).
[60] *Id.*
[61] *Id.*
[62] *See* Def.'s Answer at ¶ 15.
[63] Def.'s Answer at ¶ 15.
[64] *See* Def.'s Answer at ¶ 15; Exhibit 11 at ¶ 4 (APP. 188).

**PLAINTIFF'S BRIEF IN SUPPORT OF ITS RESPONSE IN
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**                              **Page 15**
DAL77,730,987v9

the Stadium, which caused chaos, including 30 arrests for public intoxications, all within 150-200 feet of the Apartment Complex.  Defendant's only "plan" for this influx of traffic into the area during these events is to close down Randol Mill Road, Cedarland Plaza Boulevard, Legends Way, and other roads that surround the Apartment Complex to provide private thoroughfares and direct pedestrian access to the Stadium for the Cowboys' highest-paying ticketholders and VIPs and to place a Hazmat checkpoint direct outside the front gates of the Apartment Complex.[65]  In particular, Defendant uses Randol Mill Road as a primary pedestrian artery for special events, funneling up to 90,000 people down Randol Mill Road – Enclave's virtual front yard – within feet of the Apartment Complex.[66]

Defendant did not consult Enclave in connection with preparing any plans for traffic, crowd control, safety or emergency services for the area in and surrounding the Apartment Complex.[67]  Defendant did not prepare such plans.  Instead, it turned over all responsibility for preparing, revising, and implementing such plans to the Cowboys, while leaving itself as a mere consultant and reviewer of the Cowboys' plans.  No one from the City ever asked for Enclave's opinion or asked for input or options as to how to minimize the traffic, safety or access problems for residents and guests of the Apartment Complex.[68]  No one with the fire or police departments ever contacted Enclave to discuss any safety concerns or access issues for emergency response vehicles.[69]  Before Enclave filed this suit, Defendant repeatedly ignored Enclave's reasonable inquiries regarding the status of any plans to provide reasonable access to the Apartment

---

[65] Exhibit 1 at ¶ 13  (APP. 004); Exhibit 6 at 102:14 – 105:19 (APP. 138-141).
[66] Exhibit 1 at ¶ 20 (APP. 007).
[67] Exhibit 1 at ¶ 16 – 17 (APP. 005-006); Exhibit 6 at 100:3 – 100:6; 41:9 – 41:13; 51:12 – 51:21 (APP. 077, 087, 136).
[68] Exhibit 6 at 41:9 – 41:13 (APP. 087).
[69] *Id.* at 51:12 – 51:21 (APP. 087).

Complex.[70] Prior to filing suit, Enclave also requested documents and traffic control plans from Defendant under the Public Information Act, but Defendant only recently begin providing the documents Enclave requested.[71] Defendant admits that Enclave asked that Randol Mill Road not be closed, but evidently never considered that a valid option.[72] Indeed, but for this litigation, Defendant would have made no effort to grant any access to Enclave's residents and guests.

Up until recently, Defendant never invited Enclave to attend planning or other public meetings or notified it of any plans in connection with the design and construction of the Stadium or the condemnation of surrounding properties.[73] Moreover, Defendant broke its commitment to meet with Enclave on a quarterly basis to discuss planning issues and, when it did attend these meetings, Defendant sent a representative that had no authority to assist Enclave.[74] The only "guidance" offered by Defendant is its admission that the plan will "evolve" over time, that traffic and access "will be the worst during the first year of the Stadium" and, despite having years to come up with a reasonable solution for the Apartment Complex, that it cannot be expected to settle on a plan at anytime after the Stadium opens.[75] Because of the constantly evolving nature of the "plan," Defendant gave no notice to Enclave's tenants prior to beginning to close roads for special events and tenants are forced to constantly adapt to changing conditions.[76] Before the lawsuit, it was virtually impossible for Enclave to predict the impact of the Stadium facility on its operations as a multi-family dwelling.[77]

But for this lawsuit, Defendant would not have lifted a finger or made any concession for Enclave in its traffic and pedestrian, safety, and emergency access plans. Indeed, as the Court

---

[70] Def.'s Answer ¶ 25; *see also* Exhibit 1 at ¶¶ 11-17 (APP. 004-006).
[71] Def.'s Answer ¶ 25.
[72] Exhibit 6 at 93:10 – 93:14 (APP. 129).
[73] Exhibit 1 at ¶¶ 11-17 (APP. 004-006).
[74] *Id.* at ¶ 11 (APP. 004).
[75] *Id.* at ¶ 16 (APP. 005-006).

witnessed at the Injunction Hearing, only on that very day did Defendant finally "offer" to allow tenants and employees of the Apartment Complex to enter and leave the property without a "tag."[78]  Despite these promises, Defendant has failed to honor its commitments to this Court because police officers (1) refuse to allow tenants and guests ingress and egress, regardless of whether they have a tag; and (2) refuse to assist tenant vehicles in leaving the area by holding back the flow of pedestrians and instead telling tenants that "we work for the Stadium, not the Enclave."

**E.     Under the Agreement between Defendant and the Cowboys, Defendant Is in All Respects Subservient to the Cowboys.**

None of the foregoing problems are a surprise because before this lawsuit began, Defendant has been more concerned with creating a private driveway for Jerry Jones and his personal guests and meeting the demands of the Cowboys than granting reasonable access to the residents and guests of the Enclave.[79]  The available documents and testimony in this matter indicate that Defendant is subservient to the Cowboys in virtually all aspects of planning and control over decisions involving the Stadium.[80]  In particular, the various contract documents between Defendant and the Cowboys—documents that Enclave reviewed and relied upon prior to filing suit—cede authority to the Cowboys for traffic planning and road closures, require Defendant to condemn and make property available to the Cowboys, grant the Cowboys a veto right over the City's use of funds for the Stadium, and vest the Cowboys with the exclusive right to decide Stadium events.

---

[76] Exhibit 6 at 43:11 – 43:13 (APP. 079).
[77] Exhibit 1 at ¶¶ 11-17 (APP. 004-006).
[78] Exhibit 6 at 12:18 – 14:22 (APP. 048).
[79] *Id.* at 103:8 – 103:25 (APP. 139).
[80] Enclave obtained and reviewed these documents prior to filing suit.  Since they demonstrate on their face Defendant's abdication of its duties to protect and serve the citizens and businesses of Arlington, especially the Apartment Complex and its tenants and employees, and Defendant failed to do anything to assist the Enclave prior to Enclave filing suit, Enclave had far more than a good faith basis for bringing this action.

In December 2004, Defendant entered into a master development agreement (the "Master Agreement") with the Cowboys for the ownership, design, construction and leasing of the Stadium for the Dallas Cowboys professional football team.[81]   The Master Agreement purports to be a joint effort between the Cowboys and Defendant intended to serve "public purposes."[82] In fact, it requires Defendant to abdicate its authority to the Cowboys on numerous matters, including stadium construction and traffic control.[83]   In particular, section 3.4 of the Master Agreement states that "[a]t the [Cowboys'] request and in accordance with the Master Plan, [Defendant] may consider closing any streets or alleys that would constitute any portion of the site for The Cowboys Stadium Complex."[84]   Section 1.4 of the Master Agreement also states that "the [Cowboys] shall have exclusive control over the planning, design, engineering and construction of the [Stadium] . . . ."[85]   The Master Agreement also grants the Cowboys the exclusive authority to select contractors and engineers and make changes to the construction plans.[86]

The contract documents between the Cowboys and City also give the Cowboys significant control over the finances for the Stadium.  In particular, the Complex Funding and Closing Agreement grants the Cowboys the right to veto any expenditures from the joint project fund, which was established to pay costs associated with the Stadium.[87]   These joint costs include all costs associated with *condemnation*, construction and roadway improvements.[88]   The Master Agreement also requires Defendant to contribute money to the Cowboys' condemnation

---

[81] Exhibit 16 (APP. 204-253).  A true and correct copy of the Master Agreement was acquired from the City of Arlington's website for the construction of the Stadium (http://www.ci.arlington.tx.us/cowboys/legal.html).
[82] *Id.* at § 1.3 (APP. 212).
[83] *Id.* at §§ 1.4, 3.4, 3.5, 3.6 (APP. 212, 227).
[84] *Id.* at § 3.4 (APP. 227).
[85] *Id.* at § 1.4. (APP. 212-213).
[86] *Id.* at §§ 1.5, 1.6, 1.10 (APP. 213, 215).
[87] Exhibit 29 at § 3.3(c) (APP. 368).
[88] Exhibit 16 at § 2.1 (APP. 218) (emphasis added).

**PLAINTIFF'S BRIEF IN SUPPORT OF ITS RESPONSE IN**
**OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**                    Page 19
DAL77,730,987v9

and construction efforts and gives the Cowboys the right to request money from Defendant for "project costs."[89]    In particular, section 3.2 of the Master Agreement requires Defendant to acquire "the land" via "purchase, gift, donation or the exercise of the power of eminent domain" for the exclusive use of the Cowboys.[90]  These condemnation costs are required to be paid with a portion of the funds that Defendant contributes to the project.[91]

Defendant and the Cowboys are also parties to a Complex Lease Agreement ("Lease Agreement") that, like the Master Agreement, confers substantial control over the Stadium to the Cowboys.[92]  For example, section 4 of the Lease Agreement requires Defendant to acquiesce to all the Cowboys' demands for road closures and improvements during stadium construction.[93] The Lease Agreement also requires Defendant to acquire necessary properties for the construction of the Stadium "at all times as required by [the Cowboys] . . . ."[94]  Section 4.9 of the Lease Agreement grants the Cowboys the unchecked right to demolish and improve sections of the land acquired in connection with the Stadium construction.[95]   The Lease Agreement also divests Defendant of any right to determine the events held at the Stadium and cedes all authority for such decisions to the Cowboys.[96]

Moreover, section 5.8 of the Lease Agreement states that "Tenant may close, redirect the traffic flow of or otherwise restrict access to streets to and around the cowboys Stadium on event days, to the extent permitted by Defendant's Department of Public Works and under the supervision and direction of such department."[97]  Despite the Lease Agreement's language and

---

[89] Exhibit 16 at §§ 2.1, 2.3, 2.6, 2.7 (APP. 218-224).
[90] *Id.* at § 3.2 (APP. 227).
[91] *Id.* at § 3.3 (APP. 227).
[92] Exhibit 17 (APP. 254-320).
[93] *Id.* at §§ 4.5, 4.6 (APP. 279).
[94] *Id.* at § 4.2(a) (APP. 278).
[95] *Id.* at § 4.9 (APP. 281-282).
[96] *Id.* at § 5.1(c) (APP. 284); Exhibit 6 at 81:6 – 81:11 (APP. 117).
[97] *Id.* at § 5.8(b) (APP. 288-289).

Enclave's concerns and complaints over the past year, Trey Yelverton, Defendant's Deputy City Manager for Economic Development, admitted at the Injunction Hearing that Defendant made no changes to the Cowboys' traffic control plan as it relates to Randol Mill Road and Cedarland Plaza Boulevard.[98]   Accordingly, for all intents and purposes, the traffic management plan is the creation of the Cowboys and serves the private interests of the Cowboys.

**F.      Documents Produced by the Cowboys and Defendant Further Establish that Defendant Is in All Respects Subservient to the Cowboys.**

Additionally, some of the documents produced by Defendant and the Cowboys in this matter further illustrate the master-servant relationship that exists between the Cowboys and Defendant.   In particular, the following documents contain some evidence that the Cowboys control the decision making process for Defendant:[99]

- Despite Defendant's claims that it had established an as-yet-unseen badge access program, a March 9, 2009 email between the Cowboys and Defendant indicating that Defendant deferred to the Cowboys regarding the badge scheme discussed by Melton, Hymer, and Yelverton at the Injunction Hearing;[100]

- A February 24, 2009 memorandum to the Cowboys describing the traffic management plan as "the Cowboys TMP;"[101]

- A July 27, 2009 email from Defendant to the Cowboys about minimizing "wait times" specifically for "ownership vehicles;"[102]

- Letter from the Cowboys to Defendant detailing the "Cowboys' Gameday Operations Manual" and how it will serve as the guide for

---

[98] Exhibit 6 at 79:10 – 80:4 (APP. 115-116).

[99] Notably, as discussed at a telephonic hearing held with the Court on September 8, 2009, the time to conduct meaningful discovery has been extremely limited and Enclave has not been able to take depositions or conduct a complete or meaningful review of all the documents produced by Defendant and the Cowboys in this matter. In fact, Defendant turned over approximately 30,000 additional pages of discovery on September 23, 2009, 3,000 pages on September 24, 2009, only one week before the deadline for Enclave's Response to Defendant's Motion, and 1,000 pages on September 29, the day before Enclave's deadline. As a result, the documents referenced herein from Defendant's production may not represent all the available evidence in this matter, or even the best evidence, as other documents may exist buried within the documents Defendant just produced.

[100] Exhibit 18 (APP. 321).

[101] Exhibit 19 (APP. 322).

[102] Exhibit 20 (APP. 323).

traffic management on days when events are held at the Stadium;[103] and

- Memorandum from the Cowboys to Defendant establishing that the Cowboys determine the level of security personnel staffed at and around the Stadium for special events.[104]

Defendant went to great lengths at the Injunction Hearing to paint a picture of reasonable conduct by its representatives and legitimate government purposes being served by the Stadium and road plans, but its documents indicate that some of the routing decisions were not motivated by public safety concerns, but rather, the Cowboys' pocketbook. For example, in an April 9, 2009 teleconference among representatives of the Defendant, Cowboys, Rangers, and other consultants, the parties discussed removing the concrete median dividing parts of Legends Way, which prevents motorists from turning left on Legends Way from Cedarland Plaza Boulevard.[105] The ability to turn left from Cedarland Plaza Boulevard would potentially help with access problems at the Apartment Complex, at least with exiting vehicles. However, at least for that part of the median located south of the Stadium, "[t]he idea of relocating the street light pole and removing the island at the Legends Way & division [sic] intersection is something the Cowboys [didn't] want to spend money on."[106]  As a result, some question remains about the reasons for routing decisions and whether Defendant and the Cowboys' plans were motivated by safety concerns or the desire to save money.

It also appears from other documents produced by the Cowboys that the Cowboys were not overly concerned with obtaining input or feedback from the public or residents in putting together its "reasonable" plan.   For example, in a September 11, 2008 teleconference held between the Cowboys, Defendant, Rangers, and various others, the parties discussed the issue of

---

[103] Exhibit 21 (APP. 324).
[104] Exhibit 22 (APP. 325).
[105] Exhibit 23 at 1-2, ¶ 10 (APP. 326-327).