obtaining public input about the Cowboys' traffic plan.[107] The Cowboys declined, stating that "there was no need for public input."[108]

## G. The Cowboys and Defendant Have Always Known the Stadium Would Destroy the Value of the Enclave and was an Attractive Condemnation Target.

Throughout this litigation Defendant has maintained that the value of the Enclave has not been impacted by the Stadium, the Enclave was never considered for condemnation, and that leaving the Enclave in its current state as a multi-family property is consistent with the plan the Cowboys and Defendant have for the entertainment district.[109] It has even contended that the value of the Apartment Complex would increase because of the Stadium. Such a claim is not only specious, but directly contrary to information contained in documents produced by the Cowboys. In a June 14, 2006 email between Jud Heflin and Stephen Jones, both of the Cowboys, Heflin states that he "took the opportunity to ask [the Mayor] about the Enclave. [The Mayor] asked that we highlight the reasons for its necessity."[110] Attached to the email is a document containing discussion points about the "necessity" of the Enclave.[111] In particular, Heflin described the Enclave as the most proximate opportunity to add premium parking for the Stadium and that, given other available options, the most attractive property for acquisition. [112] Critically, Heflin conceded that the Stadium will damage the Enclave:

> The Enclave is adjacent to a 24 hour commercial facility, and thus arguably its highest and best use *is no longer residential*; their occupants will be subjected to not only the DC venue construction over the next 3 years; but, the redevelopment of their adjacent roads (Randol Mill and Pennant Drive); the major construction on I-30; and the development of

---

[106] *Id.*
[107] Exhibit 24 at ¶ 2 (APP. 330-331).
[108] *Id.*
[109] Exhibit 6 at 28:10 – 28:15 (APP. 064).
[110] Exhibit 25 at 1, ¶ 2 (APP. 332).
[111] *Id.* at 3 (APP. 335).
[112] *Id.*

Glorypark; it is not unlikely that their occupancy will be challenged to stay at current levels.[113]

Heflin also notes that "[n]otices to vacate [at the Enclave] have increased since [the Stadium] venue has commenced construction."[114] Heflin recommended that the Enclave be condemned. The City, despite this information from its partners, refused. Thus, the Cowboys and Defendant had concluded years ago that the business of the Apartment Complex would be destroyed by construction and operation of the new stadium. As shown by the evidence of financial damage to the Apartment Complex between the fall of 2008 and May 2009, they were exactly right. But Defendant and the Cowboys refused to condemn the Apartment Complex and now Defendant disingenuously claims that a Stadium in the front yard is a "new business opportunity" and "what has happened to the apartments is it's changed but not lost."[115]

## IV.   APPLICABLE LEGAL STANDARD

Under Rule 56, summary judgment is appropriate only when the pleadings and record evidence show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. *See Recursion Software, Inc. v. Interactive Intelligence, Inc.*, 125 F. Supp. 2d 756, 763 (N.D. Tex. 2006). The burden is on the movant. *See id.* The court must review all evidence in the record, giving credence to evidence favoring the nonmovant as well as "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses," and disregarding evidence favorable to the movant that the jury would not be required to believe. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 152 (2000). Further, "the court must draw all justifiable inferences in favor of the nonmovant." *Keelan v. Majesco Software, Inc.,* 407 F.3d 332, 338 (5th Cir. 2005). If the

---

[113] *Id.* (emphasis added).
[114] Exhibit 25 at 3 (APP. 335).
[115] Exhibit 6 at 9:24 – 9:25, 10:16 – 10:18 (APP. 045-046).

movant meets its burden, the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). The court must view all of the evidence in the light most favorable to the non-movant and may not make credibility determinations or weigh the evidence. *See Munoz v. Orr,* 200 F.3d 291, 302 (5th Cir. 2000); *Reeves,* 530 U.S. at 150.

In contrast, to obtain summary judgment on an affirmative defense, the movant "must establish beyond peradventure *all* of the essential elements of the . . . defense to warrant judgment in [its] favor." *Martin v. Alamo Cmty. Coll. Dist.,* 353 F.3d 409, 412 (5th Cir. 2003). To defeat summary judgment, the nonmovant can meet its burden merely by pointing the court to the absence of evidence to support the movant's defenses. *See Momax, LLC., v. Rockland Corp.,* 2005 WL 839402, *7 (N.D. Tex. April 11, 2005).

## V.     LAW AND ANALYSIS

### A.     Defendant is not Entitled to Summary Judgment on Enclave's Fourth Amendment Claim.

Defendant engages in a clear misrepresentation of case law in an effort to cobble together a myriad of purported legal standards to support its erroneous position that Enclave is not entitled to the protections of the Fourth Amendment. Specifically, Defendant seeks to avoid the reach of the Fourth Amendment by (1) claiming that no violation occurred because blatant acts of interference with private property that do not amount to a literal "physical tearing" of property from its foundation are not "seizures;" and (2) claiming that it is not "unreasonable" to close all the streets surrounding the Apartment Complex and cause massive delays for guests and visitors of the Apartment Complex simply to create a private driveway for the Cowboys and the hundreds-of-thousands of vehicles and pedestrians visiting the Stadium. As set forth below,

Defendant's arguments conflict with established Fourth Amendment jurisprudence and the facts of this case. Accordingly, Defendant is not entitled to summary judgment on Enclave's Fourth Amendment seizure claim because substantial issues of material fact remain regarding Defendant's unreasonable interference with Enclave's possessory interest in the Apartment Complex.

### 1. The Fourth Amendment protects against unreasonable interferences with private property.

The Fourth Amendment, made applicable to the States by the Fourteenth Amendment, declares: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV; *see Freeman v. City of Dallas*, 242 F.3d 642, 648 (5th Cir. 2001). A violation of the Fourth Amendment occurs when (1) "there is some *meaningful interference* with an individual's possessory interests in that property;" and (2) the seizure is "objectively *unreasonable*." *See Soldal v. Cook County, Ill.*, 506 U.S. 56 (1992) (emphasis added); *United States v. Jacobsen*, 466 U.S. 109, 113 (1984) (emphasis added).

As recognized by the Supreme Court and Fifth Circuit, the Fourth Amendment applies in equal force to civil as well as criminal seizures and may be invoked to protect unreasonable restrictions on the use of real and personal property. *United States v. James Daniel Good Real Property*, 510 U.S. 43 (1993); *Soldal v. Cook County, Ill.*, 506 U.S. 56 (1992); *Severance v. Patterson*, 566 F.3d 490, 501 (5th Cir. 2009). Moreover, the Supreme Court has unanimously held that governmental interference with individual property rights may breach more than one provision of the Constitution. *James Daniel Good Real Property*, 510 U.S. at 49-50. In

particular, separate claims for unconstitutional seizures and takings of property may coexist, *Presley v. City of Charlottesville, Va.*, 464 F.3d 480, 487 (4th Cir. 2006), as well as substantive due process, procedural due process, equal protection and takings claims. *Simi Inv. Co. v. Harris County*, 236 F.3d 240, 248-49 (5th Cir. 2000); *John Corp. v. City of Houston*, 214 F.3d 573, 584-85 (5th Cir. 2000). The elements of a violation of the Fourth and Fifth Amendments differ, "with the touchstone of a takings claim being lack of just compensation and that of a seizure claim being its unreasonableness." *Presley,* 464 F.3d at 485; *see also United States Bank, N.A. v. City of Irving*, No. 3:06-CV-1805-G, 2007 WL 1073769, at *4 (N.D. Tex. Apr. 5, 2007) (Fourth Amendment claim not subsumed by Fifth Amendment claim).

In this case, Defendant's conduct is wholly unreasonable and amounts to an unconstitutional seizure of private property. As set forth below, Enclave maintains a possessory interest in private property and Defendant meaningfully and unreasonably interfered with Enclave's right of possession. Accordingly, genuine issues of material fact remain as to the issues contained herein and Defendant's Motion should be dismissed.

> **2.** **_Genuine issues of material fact exist regarding Defendant's meaningful interference with Enclave's possessory interest in the Apartment Complex._**

Defendant claims in conclusory fashion that it did not meaningfully interfere with Enclave's use of and access to the Apartment Complex because "meaningful interference," in the context of the Fourth Amendment, requires literal "dispossession" of property that amounts to a physical "tearing" or removal of an owner's property. Put differently, Defendant misstates the standard for Fourth Amendment violations by claiming that all interferences that fall short of "physically tearing" property from its foundations are not seizures. To reach this conclusion, Defendant latches onto the use of the word "dispossession" in various court cases in an attempt to rewrite the legal standard for "meaningful interference." But a physical or violent event of

"dispossession" is not required for Fourth Amendment claims. *Presley*, 464 F.3d 480. Indeed, the Supreme Court has held that a seizure of property occurs whenever "there is some meaningful interference with an individual's possessory interests in that property." *Jacobsen*, 466 U.S. at 113. "Courts have found seizures when personal property has been destroyed or devalued by state action." *Gonzalez v. City Plan Com'n*, No. Civ.A.3:05-CV-1737-M, 2006 WL 278985, at *3 (N.D. Tex. Feb. 3, 2006). Even temporary or partial seizures of property invoke the protections of the Fourth Amendment. *See United States v. Place*, 462 U.S. 696, 705 (1983) ("The intrusion on possessory interests occasioned by a seizure of one's personal effects can vary both in its nature and extent."); *Pepper v. Village of Oak Park*, 430 F.3d 805, 809 (7th Cir. 2005) (noting that "substantial damage to [a] couch" was a seizure); *United States v. Gray*, 484 F.2d 352, 356 (6th Cir.1973) (holding that temporarily removing rifles from a closet to copy down their serial numbers was a seizure). Notably, none of the cases cited by Defendant in its Motion stand for this proposition. As shown below, it is specious to claim that someone has not been dispossessed of their property, at least temporarily, when they are entirely denied access to it.

Other courts have rejected Defendant's erroneous interpretation of case law. In *Presley*, a private property owner brought a 42 U.S.C. § 1983 (2000) action against the City of Charlottesville and a nonprofit private corporation for publishing a map that showed a public trail crossing her yard. 464 F.3d 480. Presley argued that defendants' failure to correct this mistake and subsequent prosecution of Presley when she took steps to prevent trespass on her property violated her Fourth Amendment and due process rights. *Id.* at 482. In a holding that mirrors Defendant's position in this matter, the district court relied on *Soldal* and held that no seizure occurred because Presley was not "completely deprived . . . of her possessory interests in her property." *Presley v. City of Charlottesville*, No. 3:05-CV-00010, 2005 WL 2487952, at *3

(W.D. Va. Oct. 7, 2005) ("a public trail through the backyard, however discomfiting to Plaintiff, is not the same as the forcible seizure and removal of her house."). The Fourth Circuit soundly rejected the district court's (and Defendant's) interpretation of *Soldal* and held that "a deprivation need not be this severe to constitute a seizure subject to constitutional protections." *Presley*, 464 F.3d at 487. According to the *Presley* court, a physical seizure of property is not required to support a Fourth Amendment claim:

> Presley has alleged an "interference with" her "possessory interests" that is clearly "meaningful"; indeed, this interference has assertedly been disruptive, stressful, and invasive. Her complaint states that she has been deprived of the use of part of her property due to the regular presence of a veritable army of trespassers who freely and regularly traverse her yard, littering, making noise, damaging her land, and occasionally even camping overnight. This constant physical occupation certainly constitutes a "meaningful interference" with Presley's "possessory interests" in her property.

*Id.*

The correct standard for Fourth Amendment claims is "meaningful interference," not "permanent dispossession" as argued by Defendant. Under such a standard, Defendant "meaningfully interfered" with Enclave's use and enjoyment of the Apartment Complex. In particular, on game and special event days, tens-of-thousands of pedestrians and vehicles pass within a couple of feet of the Enclave, blocking driveways and preventing access to and from the Apartment Complex.[116] Employees, residents and guests sometimes wait greater than ten minutes just to leave or enter the property.[117] People party in the parking lots before and after games exposing the Enclave's residents to loud and boisterous conduct that has resulted in numerous complaints from these residents to Enclave's management.[118] Indeed, since the opening of the Stadium, the area surrounding the Enclave and Stadium has been plagued with

---

[116] Exhibit 3 at ¶¶ 5-13 (APP. 014-016); Exhibit 5 at ¶¶ 5-9 (APP. 035-036).
[117] Exhibit 3 at ¶ 13 (APP. 016).

arrests for public intoxication and DWI.[119]   Even the operations manager for the Stadium has

been arrested for DWI and the TABC is investigating whether to revoke the Cowboys' liquor

license.[120]   Special events and games last late into the night and cause significant noise and

disruption, thus making it virtually impossible for families with small children to live at the

Apartment Complex.[121]   For example, the Cowboys make a habit of firing-off loud fireworks for

certain events, which, in the words of some residents, sound like bombs going off in the area.[122]

Despite Defendant's recently enacted badge scheme that purportedly allows residents or

guests to bypass Defendant's street barricades by flashing an official badge, problems still exist

with providing reasonable access to and from the Apartment Complex.  According to Defendant,

its police officers have all been instructed that anyone with an appropriate badge will be allowed

to go around the multiple street barricades surrounding the Apartment Complex.[123]   However,

Enclave's management has received multiple complaints from residents that police officers

manning these barricades often refuse to allow access to a resident and claim ignorance of the

badge system.[124]   The fact that individuals *with* badges cannot bypass these barricades is

especially problematic given Defendant's assurances to this Court at the Injunction Hearing that

people *without* badges should also be able to enter the property simply by telling an officer that

they intend to visit the Apartment Complex.[125]   As established at the injunction hearing,

interference with Enclave's access to unexpected visitors, walk-ins and guests severely cripples

Enclave's ability to generate business and secure new tenants.  Indeed, Enclave's occupancy

rates have dropped dramatically since the opening of the Stadium and genuine issues of material

---

[118] Exhibit 4 at ¶¶ 8, 13-15 (APP. 019, 020).
[119] Exhibit 28 at 1-12 (APP. 350).
[120] Exhibit 13 (APP. 198-199); Exhibit 14 (APP. 200).
[121] Exhibit 4 at ¶ 15 (APP. 020).
[122] *Id.* at ¶ 13 (APP. 020).
[123] Exhibit 6 at 11:7 – 12:17 (APP. 047-048); Exhibit 4 at ¶¶ 9-10 (APP. 019)
[124] Exhibit 4 at ¶¶ 11-12 (APP. 019-020); Exhibit 3 at ¶ 13 (APP. 016).

fact remain as to the Defendant's impact on the value of Enclave's property. *See Gonzalez*, 2006 WL 278985 at *3 (seizure of property may occur where property is devalued by state action). None of these problems were unexpected – Defendant ignored Enclave's overtures for nearly a year before throwing its badge plan together literally two nights before the Injunction Hearing in an effort not to appear unreasonable before the Court. Indeed, Defendant and the Cowboys expected exactly this: that the Enclave's residential apartment business would be destroyed.[126]

Even if "dispossession" is the standard, which it is not, in light of the foregoing facts, genuine issues of material fact remain regarding whether Defendant's use of road closures and placement of a stadium within thirty feet of the Apartment Complex amounts to "dispossession." As Enclave's evidence demonstrates, residents and guests of the property are sometimes prevented from accessing or leaving the property due to road closures and unmanageable traffic jams and pedestrian hordes.[127] Moreover, unlike open fields and abandoned properties, homes and lodging are entitled to increased protection under the Fourth Amendment. *See James Daniel Good Real Prop.*, 510 U.S. at 77 ("The sanctity of the home recognized by this Court's cases is founded on a concern with governmental intrusion into the owner's possessory or privacy interests-the domain of the Fourth Amendment."). And, the fact that these "dispossession" events happen on an almost weekly basis and last for hours at a time only further supports the conclusion that Defendant's conduct amounts to an unconstitutional seizure of property. *See Place*, 462 U.S. at 709 ("the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion").

---

[125] Exhibit 6 at 12:18 – 13:17 (APP. 048-049).
[126] Exhibit 25 at 3 (APP. 335).
[127] Exhibit 4 at ¶ 11-12 (APP. 019-020); Exhibit 3 at ¶ 5-13 (APP. 014-016); Exhibit 5 at ¶¶ 5-9 (APP. 035-036).

Given the foregoing, genuine issues of material fact exist regarding Defendant's ongoing seizure of the Apartment Complex. As in *Presley*, Defendant's actions certainly amount to "disruptive, stressful, and invasive" conduct of the type and nature within the purview of the Fourth Amendment. Defendant therefore cannot establish that no genuine issues of material fact exist as to Enclave's Fourth Amendment claim and thus, Defendant's Motion must be denied.

3.    ***Genuine issues of material fact exist regarding the "reasonableness" of Defendant's interference with Enclave's possessory interest in the Apartment Complex.***

Summary judgment should be denied because genuine issues of material fact exist regarding the reasonableness of Defendant's conduct.  Under the Fourth Amendment, "[d]etermining whether a particular seizure is reasonable is a fact-intensive process, which requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Hill v. City of New York*, No. 03 CV 1283(ARR), 2005 WL 3591719, at *3 (E.D.N.Y. Dec. 30, 2005) (internal quotations omitted); *see also Soldal*, 506 U.S. at 71 (A determination of reasonableness requires a "balancing of governmental and private interests."); *Freeman v. City of Dallas*, 242 F.3d 642 (5th Cir. 2001) ("reasonableness standard is one that reflects a careful balancing of governmental and private interests."). The Fourth Amendment's balancing test is a fact-intensive inquiry "that is highly sensitive to the circumstances of the particular case." *Jarrett v. Town of Yarmouth*, 331 F.3d 140, 148 (1st Cir. 2003); *see also Schmalz v. Oleszak*, No. 08-C-313, 2009 WL 2766740, at *1 (E.D. Wis. Aug. 31, 2009) ("Determining whether a particular seizure is reasonable is a fact-intensive process"). As the Fifth Circuit noted, "there is no Supreme Court caselaw directly on point" that establishes a bright-line test for reasonableness. *Freeman*, 242 F.3d at 649. Critically, "[b]ecause the 'reasonableness' test is so highly fact-intensive, it is often resistant to

summary judgment motions." *Blackmon v. Regis*, No. 95 C 4559, 1996 WL 660650, at *3 (N.D. Ill. Nov. 12, 1996); *see also Besteman v. Hager*, No. 06-10223-BC, 2007 WL 1686513, at *6 (E.D. Mich. Jun. 8, 2007) (Fourth Amendment excessive force case holding that "if a fact-intensive inquiry into the reasonableness of that force remains, then summary judgment is improper, and the case should go to a jury").

Under the objective balancing test followed by all courts in applying the Fourth Amendment, genuine issues of material fact exist regarding the reasonableness of Defendant's conduct. In particular, Enclave's right to access its property and enjoy the benefits of property ownership are no less than Defendant's purported interest in providing safe ingress and egress to the Stadium. Enclave provides housing to more than 700 people who expect to be able to reach their homes without interference and without being subject to hordes of people. Constitutional rights are not simply a numbers game where the interests of 90,000 fans trump the concerns of 700 residents. At the very least, issues of fact remain to complete the "fact-intensive" balancing test recognized by the courts.

Considering the known results of the first events at the Stadium, the method by which Defendant has chosen to go about providing safe access is certainly not reasonable. Melton claimed that road closures were necessary to prevent "major vehicle and pedestrian conflict," but major conflicts still occur on a regular basis.[128] Melton claimed that road closures were necessary because "[m]obility or the Enclave resident would be significant impacted by having those roads open," but Enclave's residents and guests are sometimes forced to wait almost 10 minutes before they can make a turn out of the property.[129] Melton claimed that "the tag system . . . allows people accessing Enclave to get in quickly without a stop," but some residents reported

---

[128] Exhibit 6 at 106:25 – 107:11 (APP. 142-143).
[129] *Id.*

being blocked from bypassing barricades even after displaying an access badge.[130]   None of these problems are unexpected.  As set forth above, Defendant waited until the last minute to throw a plan together that serves the primary purpose of allowing Jerry Jones to access the Stadium.

Finally, the current state of the Enclave is patently unreasonable given that Defendant abdicated its control over city planning to the Cowboys, a private entity that is primarily concerned with devising plans on the cheap and maximizing personal profit.[131]  By Defendant's own admission, the Cowboys devised the plan and Defendant rubber-stamped it.[132]   The Cowboys indicated that input from the public was unnecessary.[133]  The interests of Defendant, a municipality charged with the welfare of its citizens, and the Cowboys, a private party with profitability in mind, are diametrically opposed.  Indeed, to paraphrase the words of at least one police officer working at the Stadium, "we work for the Stadium, not the tenants at the Enclave."[134]   Accordingly, Defendant cannot claim the seizure is reasonable because the Cowboys, not Defendant, made virtually every decision that is today unreasonably restricting access to the Apartment Complex.  A municipality's fundamental duty is to protect the safety and property of its citizens, thus there exists a material issue of fact as to whether it was reasonable for the City to turn over all planning, access, safety and operational responsibilities for the world's largest stadium to its operator.

Despite Defendant's focus on the reasonableness of its traffic planning efforts in its Motion, the inquiry does not end there.  The Stadium's very existence and the decision to locate

---

[130] *Id.* at 106:25 – 107:11 (APP. 142-143).
[131] Exhibit 23 at 1, 2, ¶ 10 (APP. 326-327).
[132] Exhibit 6 at 97:10 – 101:7 (APP. 133-137).
[133] Exhibit 24 at ¶ 2 (APP. 330).
[134] Exhibit 3 at ¶ 13 (APP. 016).

the Stadium directly across the street from the Apartment Complex are contributing factors to the nature and degree of Defendant's seizure of the Apartment Complex and should be considered by the court. Since the Stadium's opening, the Apartment Complex has been plagued with late-night noise and fireworks at the Stadium, pedestrians walking by and around the Apartment Complex at all hours of the night, increased incidents of public intoxication, and an overwhelming number of negative media reports regarding problems at the Stadium.[135]  The Stadium will always cause increased motorist and pedestrian traffic and drunken fans.  Whether Defendant should have condemned the Apartment Complex may be an issue for the state court to decide, however, the reasonableness of Defendant's decision, given what the Cowboys already knew to be the case about the impact of the Stadium on the value of the property, is a necessary factor in this Fourth Amendment inquiry.

To circumvent Fourth Amendment liability, Defendant again tries to change the standard for a Fourth Amendment inquiry.  In particular, Defendant relies on dicta from *Freeman* for the proposition that in cases involving administrative and regulatory application of laws enacted pursuant to traditional police power, "non-arbitrariness" should be the standard under the Fourth Amendment.[136]  Defendant's reliance on *Freeman* is misplaced.

In *Freeman*, owners of vacant apartment buildings sued the city alleging that its destruction of the buildings as "urban nuisances" violated the Fourth, Fifth and Fourteenth Amendments. *Freeman*, 242 F.3d 642.  According to the *Freeman* court, "[t]he ultimate test of reasonableness is fulfilled in this case by the City's adherence to its ordinances and procedures

---

[135] Exhibit 4 at ¶ 13-15 (APP. 019-020); Exhibit 3 at ¶¶ 5-9 (APP. 014-015); Exhibit 5 at ¶¶ 5, 6, 8, 10 (APP. 035-036).

[136] Defendant also attempts to mislead the Court by claiming that the reasonableness standard is equivalent to the rational-basis standard that applies to substantive due process.  Enclave has not found a single case that reaches this conclusion and none of the cases cited by Defendant support such a result.  Indeed, Defendant's caselaw is not even related to the Fourth Amendment.

as a prelude to ordering the landowners to abate their nuisance structures." *Id.* at 653. In *Freeman*, the city held multiple public hearings and afforded the property owners the right to appear and defend themselves, investigated the properties, and followed established procedures and written code provisions. The decision to demolish the properties was made by an Urban Rehabilitation Standards Board ("URSB"), a disinterested panel of thirty appointed citizens. In this case, no hearings were held, no established administrative process exists for Enclave to appear and contest Defendant's unreasonable seizure of the Apartment Complex, and no code provision addresses this particular conflict. Defendant has not appointed any panel of citizens to hear Enclave's complaints, nor has it adhered to any set ordinances or procedures as a "prelude" to seizing the property.

Moreover, the *Freeman* court relied heavily on the fact that the USRB "could not operate with unbridled discretion." The municipal code specified specific grounds on which a building could be deemed a public nuisance and the USRB was required to follow the municipal code. In this case, Enclave is not aware of any published code or ordinance that guides the Cowboys' or Defendant's decisions in connection with devising traffic plans around the Stadium. Indeed, unlike in *Freeman*, a private entity, and not the government, has had absolute discretion to design traffic plans and suggest road closures, all without any input from Enclave or oversight by some government review board. Accordingly, *Freeman* does not apply in this case.

Therefore, as set forth above, genuine issues of material fact remain regarding the reasonableness of Defendant's efforts in connection with the Stadium. Contrary to Defendant's conclusory allegations, the current traffic management plan has not effectively accommodated thousands of pedestrians and vehicles and has failed to provide reasonable access to the

Apartment Complex for Enclave's residents and guests. Summary judgment is not proper and Defendant's Motion should be denied as a matter of law.

## B. Defendant is not Entitled to Summary Judgment on Enclave's Fifth Amendment Claim.

Defendant is not entitled to summary judgment on Enclave's Fifth Amendment claim because genuine issues of material fact exist regarding the nature of Defendant's taking. In particular, Defendant's conduct amounts to a taking of Enclave's property for a private use and private entity, the Cowboys. The Takings Clause prevents a governmental entity from taking private property for public use without giving the owner just compensation. U.S. CONST. amend. V. But the Takings Clause has two subclauses: the Public Use Clause and the Just Compensation Clause. These subclauses, read together, require that the government only take private property for a *public* use, and justly compensate the property owner when such taking occurs. *See generally, Hawai'i Hous. Auth. v. Midkiff*, 467 U.S. 229, 241 (1984). If the taking is for a private use, however, the taking violates the Public Use Clause and is unconstitutional. *See id.*; *Rumber v. District of Colum.*, 487 F.3d 941, 943-44 (D.C. Cir. 2007). Thus, the Supreme Court recently stated that a municipality is "no doubt [] forbidden from taking [a person's] land for the purpose of conferring a private benefit on a particular private party." *Kelo v. City of New London*, 545 U.S. 469, 477-478 (2005); *see also Midkiff,* 467 U.S. at 245 ("A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void").

The takings claims herein are simply stated: by placing the NFL's largest stadium in the Enclave's front yard and through its ever-shifting traffic plan for events at the Stadium, Defendant has effectuated a taking of the Enclave's property for the private use of the Cowboys. Enclave does not contend that the Stadium serves public purposes. Rather, Defendant has used

the Stadium to create overwhelming traffic problems, unmanageable hordes of pedestrians passing within feet of the Enclave's property, constant noise, and haphazard road closures, to take Enclave's property for the benefit of the Cowboys.[137]  Indeed, since opening the Stadium, further evidence exists of the takings Enclave and its tenants complained about at the Injunction Hearing: the faux tagging system is hit-or-miss, noise continues to pound the Apartment Complex, and traffic is so unmanageable that cars are forced to wait lengthy periods of time before gaining access to or leaving the Apartment Complex.[138]  Accordingly, Enclave's damage has been further realized and genuine issues of material fact exist regarding Enclave's Fifth Amendment Claim.

### 1.     *Defendant misrepresents the standard for Fifth Amendment takings claims.*

In what is the consistent theme of Defendant's Motion, Defendant again misstates an appropriate legal standard, this time for Fifth Amendment takings claims.  In particular, Defendant cites *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003 (1992) for the erroneous proposition that, for Enclave to recover for a regulatory taking, Enclave must prove that Defendant denied Enclave "all economically viable use of its property."[139]  Ten years after *Lucas,* in *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency,* 535 U.S. 302, 330 (2002), the Supreme Court held that *Lucas* was "limited to the extraordinary circumstance when *no* productive or economically beneficial use of land is permitted."  (internal quotations omitted) (emphasis added).  Otherwise, *"the default rule remains that, in the regulatory taking context, [the Court] require[s] a more fact specific inquiry."*  *Id.* at 332 (emphasis added).  For partial regulatory takings, the Court has explicitly refused to adopt any

---

[137] Exhibit 4 at ¶ 13-15 (APP. 020); Exhibit 3 at ¶¶ 5-9 (APP. 014-015); Exhibit 5 at ¶¶ 5, 6, 8, 10 (APP. 035-036).
[138] Exhibit 4 at ¶¶ 9-15 (APP. 019-020); Exhibit 3 at ¶¶ 5-13 (APP. 014-016); Exhibit 5 at ¶¶ 5, 6, 7, 9 (APP. 035-036).
[139] Def.'s Motion at ¶ 23.

per se rule, "preferring to examine a number of factors rather than a simple mathematically precise formula." *Id.* at 326 (internal quotations and citations omitted).

Instead, the proper inquiry is whether the regulation goes "too far" in its impact on the Enclave. *See Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922) ("while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."). Indeed, "[l]esser interferences . . . may also result in a taking." *Aero Meridian Associates DP v. City of Denison*, No. 4:06cv457, 2007 WL 2900536, at *10 (E.D. Tex. Sept. 28, 2007).  To decide if a regulation goes "too far," courts engage in a careful balancing test that considers (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. *Id.* (citing and quoting *Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 225 (1986); *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978).  Under this analysis, "the extent of the governmental intrusion may be a question for the trier of fact, but whether the facts constitute a taking is a question of law." *Aero Meridian*, 2007 WL 2900536, at *10.

### 2.     *Defendant's conduct amounts to a taking of the Apartment Complex.*

Accordingly, under *Pennsylvania Coal*, Defendant's conduct goes "too far" and amounts to an unconstitutional taking of private property.  Defendant intentionally routes approximately 100,000 Stadium visitors directly by the Enclave causing increased noise and heightening the potential for criminal events.  Defendant has closed streets surrounding the Enclave and, despite the existence of a badge or tagging system, often has refused to allow residents enter the Apartment Complex.[140]  Traffic congestion is so bad that residents and guests often wait more

---

[140] Exhibit 4 at ¶¶ 9-13 (APP. 019-020).

than eight minutes before they can make a simple right-hand turn out of the Enclave property.[141]

Most recently, a huge group of fans just across from the Enclave became hostile before entering

the Cowboys-New York Giants game.[142]    Police officers openly refuse to provide assistance to

Enclave residents attempting to enter or leave the Apartment Complex.[143]    This will lead to

problems and completely undercuts Defendant's stated desire to reduce incidents of pedestrian-

motorist interaction: Enclave residents and guests have no choice but to force their car into

crowds of pedestrians just to leave their apartment.    With road closures, some people report

travel times in excess of 40 minutes.[144]    During games and special events, traffic is so heavy that

people are able to walk from the Enclave to a local convenience store and back before traffic

moves more than 1/10 of a mile.[145]    Tenants complain because noise, fireworks and tailgating

sometimes occur late at night after families have retired for the evening and kids are asleep.[146]

Media reports also confirm these problems and at least one resident compared the problems at

the Stadium to creating a "prison" for residents.[147]

The aforementioned problems have deprived the Enclave of its "investment-backed"

expectations for the Apartment Complex.    Rents have fallen off and Enclave has been forced to

reduce prices or offer marketing incentives just to attract new tenants to the property.[148]    Many

tenants have moved out citing traffic and the Stadium as reasons for vacating the premises.[149]

Even the Cowboys believed the Stadium would damage the value of the Apartment Complex and

---

[141] Exhibit 3 at ¶ 13 (APP. 016).
[142] Exhibit 11 at ¶¶ 8-17 (APP. 338-339).
[143] Exhibit 3 at ¶¶ 6, 7, 10, 13 (APP. 014-016).
[144] Exhibit 27 at ¶ 4 (APP. 339).
[145] Exhibit 3 at ¶ 12 (APP. 016).
[146] Exhibit 4 at ¶¶ 2, 8, 13-15 (APP. 017-020).
[147] Exhibit 10 at ¶ 4 (APP. 185).
[148] Exhibit 4 at ¶¶ 17-18 (APP. 021); *see also* Exhibit 26 (APP. 337).
[149] Exhibit 4 at ¶ 17 (APP. 021).

cause problems for Enclave's residents.[150] As set forth above, Jud Heflin, a representative of the Cowboys, acknowledged as far back as 2006 that Enclave's occupancy would be challenged to stay at pre-construction levels due to the existence of the Stadium and the surrounding redevelopment.[151]

Defendant's decision to build a stadium directly across from the Enclave certainly has had a substantial negative economic impact on Enclave and denied Enclave of its investment-backed expectations for the property. Accordingly, genuine issues of material fact exist regarding the "extent of the governmental intrusion," *see Aero Meridian Associates*, 2007 WL 2900536 at *10, and summary judgment is improper.

### 3. *Defendant took the Apartment Complex to serve a private use.*

Genuine issues of material fact also exist because Defendant's claims attempt to cloak an unauthorized private taking in the guise of a legitimate public purpose. If the governmental taking is for a ***private*** purpose, the property owner need not seek compensation in state court before bringing a federal takings claim. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 543 (2005) ("Conversely, if a government action is found to be impermissible-for instance because it fails to meet the 'public use' requirement or is so arbitrary as to violate due process-that is the end of the inquiry. No amount of compensation can authorize such action."); *Samaad v. City of Dallas*, 940 F.2d 925, 936-37 (5th Cir. 1991) ("plaintiffs' failure to seek compensation for the alleged taking of their property for a private purpose does not render that claim unripe"). As set forth above, evidence shows that the current traffic management plan is not to promote public safety and health, but rather to provide a private road for Jerry Jones and other members of ownership.

---

[150] Exhibit 25 at 3 (APP. 335).
[151] *Id.*

To avoid this precedent, Defendant argues that the contested taking is for a public purpose because federal law recognizes the right of a government to build stadiums for public purposes or to engage in redevelopment efforts. Under Defendant's view everything – including traffic management plans enacted long after construction is complete and separately from development plans – are part of stadium construction and entitled to the same deferential treatment afforded government entities that engage in economic development. But the traffic management plan has nothing to do with the stadium construction "plan" or economic development and does not advance the same public purposes purportedly served by stadium construction and eminent domain planning. Indeed, Defendant essentially argues that everything it does, regardless of time, has a patina of "public use" so long as the Stadium continues to loom in the background. This broad definition of "public use" advanced by Defendant leads to the dubious result that "public use" extends *ad infinitum.* Under its theory, 20 years from now, Defendant can use the Stadium as a shield to justify unconstitutional conduct under the guise of "redevelopment."

The cases relied upon by Defendant for this argument do not extend to all post-redevelopment or construction efforts. In *Berman v. Parker*, the Court upheld a redevelopment plan targeting a blighted area of Washington, D.C., in which most of the housing for the area's 5,000 inhabitants was beyond repair. The plan called for all land in the redevelopment area to be condemned and some of the land to be sold to private parties. An owner of a store located in the area challenged the condemnation arguing that this property was not blighted and could not be condemned because the intended use of his property was not for the public at large. The Court upheld the condemnation after reviewing the condemnation area "as a whole." Unlike *Berman*, however, Enclave's property is not part of the condemnation area and no decision was ever made

to exercise the power of eminent domain over the Apartment Complex to assist with community redevelopment. The *Berman* holding is limited in application to those properties that fall within the condemnation footprint, not properties, like the Enclave, that are administratively "taken" due to post-development road closures and the creating of a private driveway for private VIPs. Indeed, if *Berman* were read so broadly, the "whole" becomes an amorphous concept justifying almost any form of government taking.

*Kelo v. City of New London*, another case cited by Defendant for this expansive reading of the Fifth Amendment, is virtually identical to *Berman*. In *Kelo*, the city, pursuant to an "integrated development plan designed to revitalize its ailing economy . . . initiated condemnation proceedings when petitioners, the owners of the rest of the property, refused to sell." *Kelo*, 545 U.S. at 469. The *Kelo* Court found the takings to be for a public use "[g]iven the comprehensive character of the plan" and "the thorough deliberation that preceded its adoption." *Id.* at 484. As in *Berman*, "the whole" considered by the *Kelo* Court comprised the condemnation footprint, not properties falling outside of the area marked for economic redevelopment. Moreover, *Kelo* taking occurred pursuant to an established plan after thorough deliberation, neither of which exists in the current litigation. Accordingly, Defendant's reliance on *Kelo* and *Berman* is misplaced.

In this case, Defendant has built the largest football stadium for the most popular football team in the NFL in Enclave's front yard and invited anywhere between 60,000 to 90,000 fans and guests to visit the stadium on an almost weekly basis. Defendant has closed roads directly surrounding the Complex and uses a faulty tagging system developed on an ad hoc basis to allow guests and residents to gain access to the property. In the end, Defendant's traffic management plan, which completely encircles the Apartment Complex in a series of road closures, barricades

and bomb-sniffing dog stations, makes it all but impossible, even with a tagging system, for non-tenants, guests, utility companies and general service providers to reach the Complex. This plan is for private purposes and serves no legitimate government purpose. Safety and public welfare are simply after-the-fact pretextual justifications for behavior that is intended solely for the benefit of the Cowboys and their paying guests. *See Kelo*, 545 U.S. at 477-78 (government cannot "take property under the mere pretext of a public purpose, when its actual purpose was to bestow a private benefit"). Accordingly, genuine issues of material fact exist regarding the intended use of Defendant's traffic management efforts; thus, summary judgment should be denied.

**C.   Defendant is not Entitled to Summary Judgment on Enclave's Fourteenth Amendment Claim.**

Genuine issues of material fact exist regarding Enclave's substantive due process claim and specifically, whether Defendant's conduct is "arbitrary and capricious." The elements of a substantive due process claim are government conduct that infringes upon a life, liberty and/or property right of the plaintiff that is so egregious that it shocks the conscience. *E.g., Rochin v. California*, 342 U.S. 165, 172 (1952). To maintain a cause of action for a violation of substantive due process, Enclave must show (1) the existence of a protected property or liberty interest; and (2) an arbitrary or capricious deprivation of that interest. *Honore v. Douglas,* 833 F.2d 565, 568 (5th Cir. 1987).

For many of the same reasons that Defendant's conduct amounts to an impermissible seizure under the Fourth Amendment, Defendant's actions also fall squarely within the purview of the Fourteenth Amendment. In this case, the City has established a traffic plan that fails to diminish any traffic around the Apartment Complex, effectively making Enclave employees and residents prisoners in their own homes for up to 25% of the year, potentially isolates the Enclave

from city services including ambulance emergency medical services, and require residents to produce identification to get to their own homes – all for the purpose of providing a private walkway for the Cowboys' VIPs to reach the stadium. This is not an issue of economic development – the development is done and the Enclave had no protest to the fact of the Stadium. Nor is keeping the streets surrounding the Apartment Complex closed to motorist traffic a safety issue – pedestrians and motorists still cross paths and intermingle. Moreover, Defendant's traffic plan has the effect of devaluing the Apartment Complex – the purpose of the Enclave's business.

The arbitrary and capricious nature of this conduct is manifested by the fact that Defendant has known of these impending problems for nearly five years, and has ignored numerous requests by the Enclave to work with it to accommodate residents and collaborate on traffic control plans so that the Enclave could assist Defendant in reaching a mutually advantageous plan that would meet the needs of the Cowboys and Enclave. As discovered, the Cowboys were not interested in public input and instead unilaterally devised plans to be rubber-stamped by Defendant. This willful indifference to the rights of the Enclave and the welfare of 700 of Defendant's own residents shocks the conscience and sets out a viable claim for substantive due process.

**D.** **Defendant is not Entitled to Summary Judgment on Enclave's Private Nuisance Claim.**

A municipality does not enjoy immunity when a private nuisance rises to the level of a constitutional taking. *Celanese Corp. v. Coastal Water Auth.*, 475 F. Supp. 2d 623, 632 (S.D. Tex. 2007); *see also City of Abilene v. Downs*, 367 S.W.2d 153, 159 (Tex. 1963) ("[I]f the construction and operation of the plant results in a nuisance, such acts of the municipality constitute a damaging or taking of the property under Section 17 of Article 1 of the Texas

Constitution."). A nuisance rises to the level of a constitutional taking when the government (1) knows that a specific act is causing identifiable harm; or (2) knows that the specific property damage is substantially certain to result from an authorized government action-that is, that damage is necessarily an incident to, or necessarily a consequential result of the government's action. *Celanese Corp.*, 475 F. Supp. 2d at 631-32 (S.D. Tex. 2007) (citing *City of Dallas v. Jennings,* 142 S.W.3d 310, 313 n.2 (Tex. 2004)). In this case, the evidence shows that the Cowboys knew as far back as 2006 that the Stadium, and all its attendant consequences, would render the Apartment Complex unfit for its intended residential use. The Cowboys, Defendant's business partner in this deal, knew that "occupancy [would] be challenged to stay at current levels." This same memorandum generated by the Cowboys makes clear that the specific property damage is "substantially certain to result from" or "a consequential result of the government's action." As a result, genuine issues of material fact exist regarding the extent of Defendant's nuisance-causing activities.

Nevertheless, Defendant seeks to hide behind the shield of government immunity. In particular, Defendant claims that closed roads, crushing pedestrian and motorist traffic, late-night noise, all-day tailgating, loitering, multiple arrests for public intoxication and DWI, terrorist threats and its use of police officers that are either uninformed of the traffic management plan or do nothing to assist Enclave's residents, do not amount to a heightened nuisance necessitating a waiver of government immunity. As Defendant's Motion generously points out, however, a compensable taking occurs under Texas law when a property owner's right of access is materially and substantially impaired, *City of Grapevine v. Grapevine Pool Rd. J.V.*, 804 S.W.2d 675, 677-78 (Tex. App.—Fort Worth 1991, no writ), whenever remaining streets do not provide a "suitable" means of access to the property, *Id*. at 678, or when all "reasonable access" has been

denied.  *See Texas v. Bristol Hotel Asset Co.*, No. 07-0896, 2009 WL 1383717, at *9-12 (Tex. May 15, 2009).

There should be no dispute that genuine issues of material fact remain regarding the reasonableness of Defendant's road planning, the suitability of remaining streets, or whether Enclave's rights have been materially and substantially impaired.  What Defendant has failed to consider or address in its Motion, however, is the overall negative impact of the Stadium structure on the Apartment Complex.  Enclave's nuisance theories are not limited to only road closures and a faulty traffic planning system.  In this case, the Stadium's close proximity has subjected Enclave to noise, pedestrian traffic, and increased crime.  These events also impact the Enclave and are so unreasonable that they rise to the level of a constitutional taking.  Accordingly, genuine issues of material fact remain and Defendant's Motion should be dismissed.

## VI.     CONCLUSION

WHEREFORE, Enclave Arlington Associates Limited Partnership requests that the Court deny Defendant's Motion for Summary Judgment in its entirety and grant Enclave such other and further relief to which it may be justly entitled.

Respectfully submitted,

Stephen C. Carlin
State Bar No. 03807700
Russell J. DePalma
State Bar No. 00795318
R. Craig Woods
State Bar No. 24042663
**GREENBERG TRAURIG, LLP**
2200 Ross Avenue
Suite 5200
Dallas, Texas 75201
Telephone: 214.665.3650
Facsimile:   214.665.3601
Email: carlins@gtlaw.com

**ATTORNEYS FOR PLAINTIFF ENCLAVE
ARLINGTON ASSOCIATES LIMITED
PARTNERSHIP**

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the following instrument was served via Certified Mail, Return Receipt Requested in accordance with the Federal Rules of Civil Procedure on September 30, 2009 on the following:

David M. Hymer
Dwayne J. Hermes
Gina Viccinelli
Christian Dennie
**Hermes Sargent Bates, L.L.P.**
901 Main Street, Ste. 5200
Dallas, Texas  75202
Facsimile: 214.749.6100


Melinda H. Barrow
**City of Arlington City Attorney's Office**
Mail Stop #63-0300
P. O. Box 90231
Arlington, Texas 76004-3231
Facsimile: 817.459.6897

_____
Stephen C. Carlin